# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JILL M. EGGERING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:07CV740 SNLJ(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Jill M. Eggering for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 9). Defendant has filed a Brief in Support of the Answer. (Doc. No. 10).

## Procedural History

On April 18, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on February 9, 2002. (Tr. 50-52). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 4, 2006. (Tr. 41-45, 9-17). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on March 30, 2007. (Tr. 2-4). Thus, this decision of the ALJ stands as the final decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on August 24, 2006. (Tr. 326). Plaintiff was present and was represented by counsel. (<u>Id.</u>). A vocational expert, Jeff Magrowski, was also present. (<u>Id.</u>). The ALJ began by admitting the exhibits into the record. (Tr. 26).

The ALJ then examined plaintiff, who testified that she was thirty-one years of age and left school in the ninth grade. (Tr. 326). Plaintiff stated that she did not finish the ninth grade. (<u>Id.</u>). Plaintiff testified that she did not obtain her GED. (<u>Id.</u>). Plaintiff stated that she never tried to obtain her GED. (Tr. 327).

Plaintiff testified that she worked as an oil change/car wash technician and a manager. (<u>Id.</u>). Plaintiff stated that she started out as a technician and became a manager. (<u>Id.</u>). Plaintiff testified that she worked at an individually-owned oil change/car wash business in St. Louis called The Express. (<u>Id.</u>).

Plaintiff stated that she also worked full-time as a car porter at a used car lot. (Tr. 328). Plaintiff testified that this position involved driving cars. (<u>Id.</u>). Plaintiff stated that she worked at this position for three to four years. (<u>Id.</u>).

Plaintiff testified that she worked as a busser at a restaurant for two years. (<u>Id.</u>).

Plaintiff stated that she also worked as a security guard for a year in 1995 or 1996. (Tr. 330). Plaintiff testified that this position involved monitoring a building and its premises. (<u>Id.</u>).

Plaintiff stated that she does not think she has worked anywhere since August of 2002. (Id.). Plaintiff testified that the last date she worked was either August of 2002 or August of 2003, but she does not remember the date. (Id.).

Plaintiff stated that she experiences constant right shoulder pain. (Tr. 331). Plaintiff testified that she is unable to hold a gallon of milk without dropping it due to her shoulder pain. (Id.).

Plaintiff stated that she is right-hand dominant. (Id.). Plaintiff testified that she is five feet, eight inches tall and weighs around 200 pounds. (Id.). Plaintiff stated that her normal weight is about 160 pounds. (Id.). Plaintiff testified that the extra weight does not affect her in any way. (Id.).

Plaintiff stated that she has been seeing a neurologist because she has been experiencing dizzy spells with falling for about two months. (Tr. 332). Plaintiff testified that this is the only physical problem other than her shoulder pain that is preventing her from working. (Id.). Plaintiff stated that she just saw the neurologist, Dr. Dwayne Turpin, the week prior to the hearing and he had not yet written a report. (Id.).

Plaintiff testified that in her opinion she does not have any psychological problems. (Id.). Plaintiff stated that Dr. John Canale, a psychiatrist, diagnosed her with panic disorder.[1] (Id.). Plaintiff testified that she stopped seeing Dr. Canale because he put her on too much medication, which made her sick. (Id.). Plaintiff stated that she was unable to get out of bed due to nausea. (Id.).

---

[1] Recurrent panic attacks that occur unpredictably. See Stedman's Medical Dictionary, 570 (28th Ed. 2006).

Plaintiff testified that she became addicted to Xanax.[2] (Id.). Plaintiff stated that she was taking Xanax at the time of the hearing. (Tr. 333). Plaintiff testified that Dr. Canale tried to wean her off the Xanax and tried 30 to 40 other medications, but none of them worked. (Id.). Plaintiff stated that she takes Xanax to calm her down when she experiences anxiety. (Id.). Plaintiff testified that Dr. William Shisko is currently prescribing the Xanax. (Id.). Plaintiff stated that she knows she suffers from anxiety. (Id.). Plaintiff testified that when she is anxious, she closes herself off from everyone. (Id.). Plaintiff stated that she sometimes becomes shaky and falls to the floor. (Id.).

Plaintiff testified that she has considered getting her GED but the thought of being around a lot of people has prevented her from trying to get her GED. (Id.). Plaintiff testified that she cannot take computer classes because she does not own a computer. (Id.). Plaintiff stated that she has not been to the Department of Vocational Rehabilitation and that she did not know the function it serves. (Id.). The ALJ noted that the Department of Vocational Rehabilitation usually requires a GED. (Tr. 334).

Plaintiff's attorney then examined plaintiff, who testified that she experiences headaches. (Id.). Plaintiff stated that she has been experiencing severe headaches for about a year prior to the hearing. (Id.). Plaintiff testified that she has headaches at least twice a day. (Id.). Plaintiff stated that the headaches feel like there is a needle sticking her in the eye and she sees spots. (Id.). Plaintiff testified that her neurologist told her that if the migraine medication she is taking does not help within two to three weeks then he would order a CAT scan. (Tr. 335).

---

[2]Xanax is indicated for the management of anxiety disorder. See Physician's Desk Reference (PDR), 2794 (57th Ed. 2003).

Plaintiff stated that she has anxiety attacks two to four times a day. (Id.). Plaintiff testified that she does not know what triggers the anxiety attacks. (Id.). Plaintiff stated that when she has an anxiety attack, she has to be by herself and relax. (Id.). Plaintiff testified that she usually sits in her recliner and listens to music until her medication takes effect. (Id.). Plaintiff stated that it usually takes between 45 minutes to an hour for the attack to pass when she takes her medication. (Id.). Plaintiff testified that she does not talk on the telephone during an anxiety attack. (Id.).

Plaintiff stated that her husband does most of the grocery shopping, although she does some shopping. (Id.). Plaintiff testified that she can walk to the grocery store. (Id.). Plaintiff stated that she does not engage in any social activities or hobbies. (Id.).

Plaintiff testified that Dr. Shisko was very unhappy with the course of medication that Dr. Canale had prescribed for her. (Tr. 336). Plaintiff stated that Dr. Shisko is currently providing her with medication. (Id.). Plaintiff testified that she is taking one milligram of Xanax three times a day. (Id.).

Plaintiff stated that she drops things with her right arm every day. (Id.). Plaintiff testified that she would not be able to pick up a gallon of milk and carry it around for eight hours a day without dropping it. (Id.).

Plaintiff's attorney then examined plaintiff's husband, Andrew Zutz, who testified that he works as a truck driver. (Tr. 337). Mr. Zutz stated that he is at home daily. (Id.). Mr. Zutz testified that plaintiff handles or manipulates objects fairly, although she frequently drops things. (Id.). Mr. Zutz stated that plaintiff drops objects between one and three times a day. (Id.).

Mr. Zutz testified that he has witnessed plaintiff's anxiety attacks. (Id.). Mr. Zutz stated

that plaintiff's anxiety attacks occur three to four times a day. (Tr. 338). Mr. Zutz testified that plaintiff gets shaky when she has an anxiety attack. (Id.).

Mr. Zutz stated that he stays in contact with plaintiff when he is over-the-road. (Id.). Mr. Zutz testified that he usually talks to plaintiff about three hours in an eight-hour day. (Id.). Mr. Zutz stated that plaintiff occasionally calls him and asks him to talk to her to calm her down. (Id.).

The ALJ then examined the vocational expert, Jeff Magrowski. (Id.). The ALJ asked Mr. Magrowski to assume a hypothetical individual who is age 26, with a ninth grade education and the same past work experience as plaintiff with the following limitations: able to understand, remember and carry out simple instructions and non-detailed tasks; able to maintain concentration and attention for simple work; able to respond appropriately to supervisors and co-workers in a task-oriented setting, where contact with the general public is limited, and able to adapt to routine changes. (Tr. 339). Mr. Magrowski testified that such an individual could perform plaintiff's past work as a busser. (Id.).

The ALJ then asked Mr. Magrowski to read the residual functional capacity assessment of Vincent Stock, an examining psychologist. (Tr. 340). Mr. Magrowski testified that based on this residual functional capacity, the hypothetical individual would not be able to return to any of plaintiff's past relevant work. (Id.). Mr. Magrowski stated that there was no work in the national or state economies that the individual could perform with those restrictions. (Id.).

Plaintiff's attorney then examined Mr. Magrowski, who testified that he had reviewed the report of Dr. David Lipsitz. (Tr. 341). Plaintiff's attorney asked Mr. Magrowski to add the following limitations to the ALJ's first hypothetical: marked difficulties in maintaining social

functioning; marked deficiencies of concentration, persistence, and pace; and a GAF[3] of 50.[4]

(Id.).  Plaintiff's attorney defined "marked" as "several activities or functions which are impaired to the degree that it seriously interferes with the ability to function independently, appropriately and effectively in that area."  (Tr. 341-42).  Mr. Magrowski testified that the individual would not be able to perform any jobs with those restrictions.  (Tr. 342).

The ALJ indicated that plaintiff's attorney could submit any additional evidence, including the report of the neurologist, within sixty days of the hearing.  (Tr. 342-43).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff saw William Shisko, D.O., for various complaints, including back pain, right shoulder pain, and anxiety, from February 2002 through April 2005. (Tr. 222-56).  Plaintiff was treated with medication.  (Id.).

Plaintiff presented to Rick W. Wright, M.D. on August 26, 2002, with complaints of right shoulder pain following a motor vehicle accident in February.  (Tr. 300-01).  Plaintiff reported significant pain and mechanical symptoms in the shoulders and feelings of instability.  (Tr. 300). Dr. Wright noted that x-rays of the right shoulder were unremarkable.  (Id.).  Dr. Wright's impression was right shoulder mild multi-directional instability.  (Id.).  Dr. Wright recommended a rehabilitation program emphasizing low weight and high repetition rotator cuff strengthening

---

[3]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[4]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

exercises.  (Id.).

Plaintiff participated in physical therapy from August of 2002 through February of 2003. (Tr. 305-11).  Plaintiff reported feeling increased strength and function, yet she still complained of pain in her shoulder with heavy activity.  (Tr. 305).

Plaintiff saw Dr. Wright for a follow-up of her right shoulder pain on October 7, 2002. (Tr. 295-96).  Dr. Wright noted that plaintiff had made "fantastic progress" in rehabilitation with range of motion and strengthening yet she continues to have pain.  (Tr. 295).  Upon physical examination, plaintiff had full range of motion.  (Id.).  Dr. Wright recommended an MRI.  (Id.).

Plaintiff saw Dr. Wright on October 28, 2002.  (Tr. 294).  Dr. Wright reported that the MRI revealed rotator cuff tendinitis but was otherwise unremarkable.  (Id.).  Dr. Wright's impression was right shoulder rotator cuff tendinitis.[5]  (Id.).  Dr. Wright administered a cortisone injection.  (Id.).

Plaintiff saw Dr. Wright on December 11, 2002, at which time Dr. Wright noted that the cortisone injection improved plaintiff's symptoms.  (Tr. 292).  Plaintiff still complained of mild feelings of instability.  (Id.).  Dr. Wright's impression was right shoulder rotator cuff tendinitis with mild anterior instability.  (Id.).  Dr. Wright recommended that plaintiff continue her rehabilitation program, which should adequately control her symptoms.  (Id.).

Plaintiff saw Dr. Wright on January 22, 2003, at which time plaintiff reported pain overhead, and behind her back, and instability.  (Tr. 290).  Dr. Wright noted that plaintiff's feelings of instability were caused by catching and clicking in the shoulder, which simulates

---

[5]Inflammation of a tendon.  See Stedman's at 1944.

instability.  (Id.).  Dr. Wright's impression was right shoulder impingement syndrome[6] with mild

potential instability.  (Id.).  Dr. Wright recommended that plaintiff continue with a conservative

strengthening exercise program before considering any operative intervention.  (Id.).

Plaintiff saw Dr. Wright on April 14, 2003, at which time plaintiff reported pain when

using her arm away from her body, overhead, and behind her back.  (Tr. 288).  Dr. Wright noted

that plaintiff had had no improvement despite diligent work on the rehabilitation program for

several months.  (Id.).  Dr. Wright's impression was right shoulder impingement syndrome versus

mild instability.  (Id.).  Dr. Wright recommended arthroscopic[7] decompression.  (Id.).

Plaintiff underwent right shoulder arthroscopic surgery on April 29, 2003.  (Tr. 287).  Dr.

Wright noted that plaintiff would begin physical therapy shortly.  (Id.).

Plaintiff saw Dr. Wright on May 12, 2003, at which time Dr. Wright reported that plaintiff

was doing great and was without complaints.  (Tr. 286).  Dr. Wright recommended that plaintiff

start physical therapy in four weeks.  (Id.).

Plaintiff saw John Canale, M.D. for a neuropsychiatric evaluation on May 21, 2003.  (Tr.

219-20).  Dr. Canale noted that plaintiff had a history of panic attacks, which have become worse

in the past year.  (Tr. 219).  Plaintiff reported symptoms of heart racing, lightheadedness,

dizziness, and shortness of breath.  (Id.).  Dr. Canale stated that plaintiff had been on Zoloft[8] for

the past year without any significant improvement and she had been taking Xanax for the past

---

[6]Pain on elevating arm and tenderness on deep pressure over the supraspinatus tendon due
to pressure of an injured or inflamed tendon.  See Stedman's at 1915.

[7]Endoscopic examination of the interior of a joint.  Stedman's at 162.

[8]Zoloft is indicated for the treatment of panic disorder.  See PDR at 2676.

three months.  (Id.).  Plaintiff denied any depressive episodes or substance abuse problems.  (Id.).

Upon mental status exam, plaintiff was found to be alert and cooperative, with a normal flow of

thought, anxious affect, no depressive symptoms, no psychotic symptoms, intact memory, and

good insight and judgment.  (Tr. 220).  Dr. Canale diagnosed plaintiff with panic disorder.  (Id.).

He continued plaintiff on Zoloft and started her on Paxil.[9]  (Id.).

Plaintiff saw Dr. Wright on June 9, 2003, at which time he reported that plaintiff was

doing well without significant complaints or problems.  (Tr. 285).  Dr. Wright recommended that

plaintiff start physical therapy.  (Id.).

On July 16, 2003, plaintiff reported that she felt significantly improved and almost had full

strength.  (Tr. 284).  Dr. Wright stated that plaintiff had done an excellent job of rehabilitating her

shoulder and should continue to work on a strengthening program.  (Id.).

On August 20, 2003, Dr. Wright reported that plaintiff had had improvement with her

symptoms but still had some pain and soreness in the shoulder with repetitive activities.  (Tr.

283).  Dr. Wright recommended that plaintiff continue on the strengthening program.  (Id.).

On October 20, 2003, Dr. Wright stated that plaintiff had significant pain relief but her

endurance remains low, and plaintiff reported popping.  (Tr. 282).  Dr. Wright administered a

cortisone injection, which completely relieved the popping.  (Id.).  Dr. Wright recommended that

plaintiff continue on the strengthening program.  (Id.).  He noted that plaintiff would follow-up in

one month, at which time he anticipated she would return to full unrestricted work activities.

(Id.).

On November 24, 2003, Dr. Wright reported that plaintiff had had some improvement

_____

[9]Paxil is indicated for the treatment of panic disorder.  See PDR at 1604.

with cortisone injections. (Tr. 281). Dr. Wright recommended that plaintiff continue working on the strengthening program for a couple months, after which she will have reached maximum improvement. (Id.).

Plaintiff presented to the emergency room at St. Joseph Health Center on August 18, 2004, with complaints of right shoulder pain after falling down in her back yard. (Tr. 273). Plaintiff was diagnosed with a shoulder contusion and was discharged, with instructions to use ice and a sling for comfort. (Tr. 272).

Plaintiff presented to John A. Garcia, M.D. on August 20, 2004. (Tr. 191). Plaintiff reported that she had fallen two days prior, landing on her shoulder. (Id.). Plaintiff complained of pain around the posterior aspect of the shoulder. (Id.). Dr. Garcia reviewed x-rays taken at the hospital, which did not reveal any fractures. (Id.). Dr. Garcia recommended ibuprofen. (Id.).

Plaintiff saw Dr. Garcia on September 10, 2004, for a follow-up of her right shoulder injury. (Tr. 191). Plaintiff complained of shoulder pain. (Id.). Upon physical examination, plaintiff could abduct her shoulder and had good strength. (Id.). Plaintiff had no rotator cuff symptoms. (Id.). Dr. Garcia's impression was muscle strain. (Id.). He recommended physical therapy and prescribed Celebrex.[10] (Id.).

Plaintiff saw Dr. Garcia on October 1, 2004, at which time plaintiff reported that she was getting better but still sore. (Tr. 190). Dr. Garcia stated that plaintiff was progressing well. (Id.). He continued plaintiff on physical therapy. (Id.).

On October 29, 2004, plaintiff reported that she was getting better with physical therapy. (Id.). Upon physical examination, plaintiff had full motion. (Id.). He recommended EMG and

---

[10]Celebrex is indicated for the management of acute pain. See PDR at 2590.

nerve conduction studies but plaintiff did not want to proceed.  (Id.).

Plaintiff saw Dr. Garcia on January 14, 2005, at which time she reported shoulder pain and popping.  (Tr. 189).  Dr. Garcia recommended that plaintiff undergo an MRI of the shoulder. (Id.).

On March 18, 2005, Dr. Garcia indicated that the MRI was negative.  (Tr. 189).  Dr. Garcia's impression was post-traumatic muscle tightness.  (Id.).  Dr. Garcia instructed plaintiff to use her shoulder as tolerated and to stop babying it.  (Id.).

Plaintiff saw Dr. Canale on April 14, 2005, with complaints of anxiety.  (Tr. 218).  Dr. Canale prescribed Effexor[11] and Lexapro.[12]

Plaintiff saw Dr. Canale on May 3, 2005, with complaints of anxiety and panic attacks. (Tr. 217).

Plaintiff saw Daniel L. Coogan, D.C. from May 2005 to June 2006 for treatment of neck pain, right arm pain, right knee pain, and back pain.  (Tr. 181-83).  Dr. Coogan treated plaintiff's complaints with spinal manipulation, moist heat, and home exercises.  (Tr. 141-84).

Plaintiff saw David A. Lipsitz, Ph.D., on June 16, 2005, for a psychological consultation at the request of the State agency.  (Tr. 210-15).  Plaintiff complained of panic attacks that occur all the time, usually when she sees doctors or is in a stressful situation.  (Tr. 210).  Plaintiff stated that her panic attacks have been occurring for five to six years.  (Id.).  Plaintiff reported that she has always avoided crowds of people throughout her life.  (Id.).  Plaintiff stated that she becomes really nervous, her heart starts beating fast, and she cannot calm down when she has a panic

---

[11]Effexor is indicated for the treatment of depression.  See PDR at 3392.

[12]Lexapro is indicated for the treatment of major depressive disorder.  See PDR at 3532.

attack. (Id.). Plaintiff indicated that she cannot leave her home due to the panic attacks. (Id.).

Dr. Lipsitz stated that plaintiff began seeing Dr. Canale on an outpatient basis in April of 2004

and that Dr. Canale was able to end her addiction to Xanax. (Tr. 211). Plaintiff reported that she

attended school until the ninth grade, at which time she "just got frustrated and quit." (Tr. 212).

Upon mental status examination, Dr. Lipsitz found plaintiff to be somewhat anxious and very

agitated, with a bright affect, depressed mood, but no evidence of any suicidal ideations or

impulses. (Id.). He found plaintiff's intellectual functioning to be within the average range. (Id.).

Plaintiff exhibited no memory problems for recent or remote events, her concentration was good,

and her insight and judgment were fair. (Id.). Plaintiff was able to successfully interpret

proverbs, although her thought processes were primarily preoccupied with her anxieties, fears,

insecurities, and her inability to leave her house. (Id.). Dr. Lipsitz diagnosed plaintiff with panic

disorder and assessed a GAF of 50. (Id.). Dr. Lipsitz stated that plaintiff is in need of ongoing

psychiatric treatment combining medication with individual psychotherapy. (Id.). He stated that

hopefully, medication can alleviate the anxiety and the panic disturbances so that plaintiff can

assert herself and make a better adjustment to her environment. (Tr. 213). Dr. Lipsitz expressed

the opinion that plaintiff was able to handle her own financial affairs, understand and remember

instructions, and sustain concentration and persistence with tasks. (Id.). He noted that plaintiff is

having extreme difficulty interacting socially and adapting to her environment. (Id.). Dr. Lipsitz

expressed the opinion that plaintiff has moderate restrictions in activities of daily living, marked

difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or

pace. (Id.).

James W. Lane, Ph.D., a non-examining state agency psychiatrist, completed a Psychiatric

Review Technique on June 24, 2005. (Tr. 66-79). Dr. Lane found that plaintiff's anxiety disorder caused no restrictions of activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning. (Tr. 76). Dr. Lane concluded that plaintiff retains the ability to perform simple, unskilled work with limited public interaction. (Tr. 78). Dr. Lane also completed a Mental Residual Functional Capacity Assessment. (Tr. 81-83). Dr. Lane expressed the opinion that plaintiff was not significantly limited in the ability to remember locations and work-like procedures; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; get along with coworkers or peers without distracting them; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 81-82). Dr. Lane found that plaintiff was moderately limited in the ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (Id.). Dr. Lane found that plaintiff was markedly limited in the ability to interact appropriately with the general public. (Tr. 82).

Plaintiff saw Vincent F. Stock, M.A., for a psychological evaluation in connection with her application for benefits on July 18, 2006. (Tr. 194-200). Mr. Stock described plaintiff's affect as

constricted and her mood good, although nervous. (Tr. 196). Mr. Stock found plaintiff's thought

processes to be intact, with no suicidal or homicidal thoughts. (Tr. 197). Mr. Stock noted that

plaintiff appears to be disoriented at times, as she did not know how to get to the office, and relies

on her husband for orientation fifty percent of the time. (Id.). Plaintiff's judgment was found to

be intact. (Id.). Mr. Stock administered the Wechsler Adult Intelligence Scale-Third Edition

(WAIS-III), which revealed a Full Scale IQ score of 81. (Id.). Mr. Stock described plaintiff's

level of functioning as in the low average classification. (Tr. 198). He noted that due to low

confidence and high anxiety, plaintiff's results provided a low estimate of her level of intellectual

functioning. (Id.). Mr. Stock stated that plaintiff's mental status examination reveals that plaintiff

is guarded, agitated, constricted in affect, anxious and depressed in mood, and soft and pressured

in speech. (Tr. 199). Plaintiff reported that her immediate and recent memory are impaired.

(Id.). Plaintiff's cognitive functioning was found to be intact, except for serial sevens and serial

threes. (Id.). Mr. Stock diagnosed plaintiff with panic disorder with agoraphobia[13] and borderline

intellectual functioning,[14] and assessed a GAF of 45. (Id.). Plaintiff described her activities of

daily living as follows: vacuuming for thirty minutes every day, cooking every day, going to the

grocery store two times each week, doing laundry once a week, taking care of the dogs on a daily

basis, bathing on a daily basis, and seeing her doctor and taking medications as indicated. (Id.).

Mr. Stock stated that plaintiff's social interaction skills appear to be impacted by her mental

---

[13]A mental disorder characterized by an irrational fear or leaving the familiar setting of home, or venturing into the open, so pervasive that a large number or external life situations are entered into reluctantly or are avoided. See Stedman's at 40.

[14]Borderline intellectual functioning is characterized by an IQ score in the 71-84 range. See DSM-IV at 684.

status, as she reports going out once every six months. (Tr. 200). Mr. Stock found plaintiff's ability to attend and concentrate to be impaired as to both serial sevens and serial threes. (Id.). Mr. Stock expressed the opinion that plaintiff can no longer maintain a full-time position on the open labor market due to her limitations. (Id.). Finally, Mr. Stock found that plaintiff is capable of handling funds in her own best interest. (Id.). Mr. Stock indicated that plaintiff has marked restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (Tr. 203).

Plaintiff underwent a CT scan of the head on July 27, 2006, due to complaints of dizziness, which revealed no abnormalities. (Tr. 137).

### The ALJ's Determination

The ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Social Security Act on February 9, 2002.

2. The claimant has not engaged in substantial gainful activity since at least February 9, 2002.

3. The medical evidence establishes that the claimant has anxiety disorder, but that she does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

4. The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

5. The claimant's impairments preclude: understanding, remembering and carrying out more than simple instructions and non-detailed tasks; maintaining concentration and attention on more than simple work; more than limited contact with the general public; and adapting to more than routine changes in the work

place.

6.     The claimant is thirty years old and has nine years of education, primarily in a special education curriculum.

7.     In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

8.     The claimant can perform past relevant work. This finding is based upon the credible testimony of the vocational expert.

9.     The claimant has been able to perform past relevant work since February 9, 2002.

10.    The claimant has been able to perform substantial gainful activity since February 9, 2002. The claimant was not under a disability, as defined under the Social Security Act, at any time through the date of this decision.

(Tr. 16-17).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application protectively filed on April 18, 2005, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223.

(Tr. 17).


## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.  **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is

severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in formulating her residual functional capacity. Plaintiff also argues that the ALJ erred in finding that plaintiff can perform her past relevant work. The undersigned will discuss plaintiff's claims in turn.

## 1.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating her residual functional capacity. Specifically, plaintiff contends that the ALJ erred in disregarding the opinion of examining physicians Dr. Lipsitz and Mr. Stock and relying on the opinion of a non-examining physician, Dr. Lane.  Defendant argues that the ALJ properly formulated plaintiff's residual functional capacity.

In determining plaintiff's residual functional capacity, the ALJ first properly assessed plaintiff's credibility.  "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that

the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 10). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first pointed out that plaintiff is frequently without prescribed pain medication. (Tr. 14). The failure to request pain medication is an appropriate consideration when assessing the credibility of a claimant's complaints of pain. See Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003). The ALJ also noted that there is no evidence that plaintiff was ever prescribed an assistive device for ambulation. (Tr. 14).

The ALJ stated that none of plaintiff's treating physicians have imposed any long-term mental or physical limitations on plaintiff. (Tr. 14). The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ next pointed out that plaintiff stopped working at her last position because she

was fired after a salary dispute. (Tr. 15, 195). The fact that plaintiff stopped working for reasons other than her impairments is inconsistent with her claim of disability.

The ALJ also discussed plaintiff's daily activities. (Tr. 15). The ALJ stated that plaintiff assists with household chores, goes to the grocery store twice a week, takes walks, takes care of her elderly mother, swims in her pool, drives a car, and watches television. (Tr. 15, 196). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

The ALJ also provided a detailed summary of the objective medical record. (Tr. 11-14). The ALJ found that the medical evidence does not support plaintiff's subjective complaints. (Tr. 14). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ properly concluded that plaintiff's subjective complaints were not entirely credible. The court notes that although the plaintiff stated she cannot leave her house because of panic attacks (Tr. 210), she has been diagnosed as suffering from agoraphobia and she says she only goes out every six months (Tr. 200), she also has stated that she goes grocery shopping twice a week (Tr. 199), takes care of her dogs, takes walks, and has visited her doctors on a regular basis as her medical records indicate.

Plaintiff argues that the ALJ erred in failing to make a credibility determination as to her husband's testimony. The ALJ's opinion indicates that the ALJ considered plaintiff's husband's testimony but found it was essentially a recitation of plaintiff's allegations which the ALJ found to be not credible. An ALJ, having properly discredited a claimant's complaints of disabling

symptoms, is equally empowered to reject the cumulative testimony of the claimant's relatives and acquaintances.  See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998).

Plaintiff next contends that the ALJ erred in evaluating the medical opinion evidence. Specifically, plaintiff argues that the ALJ erred in disregarding the opinion of examining sources Dr. Lipsitz and Mr. Stock and relying on the opinion of a non-examining physician, Dr. Lane.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"  Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "Ordinarily, a treating physician's opinion should be given substantial weight."  Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)).  However, such opinions do "not automatically control, since the record must be evaluated as a whole."  Id. (quoting Bentley, 52 F.3d at 785-786).  An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole.  See Johnson, 240 F.3d at 1148.  Such opinions may also be discounted when a treating physician renders inconsistent opinions.  See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).  "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).

Dr. Lipsitz found plaintiff to be somewhat anxious and very agitated, with a bright affect, depressed mood, but no evidence of any suicidal ideations or impulses.  (Tr. 212).  He found plaintiff's intellectual functioning to be within the average range.  (Id.).  Plaintiff exhibited no memory problems for recent or remote events, her concentration was good, and her insight and

judgment were fair.  (Id.).  Dr. Lipsitz diagnosed plaintiff with panic disorder and assessed a GAF score of 50.  (Id.).  Dr. Lipsitz expressed the opinion that plaintiff was able to handle her own financial affairs, understand and remember instructions, and sustain concentration and persistence with tasks.  (Id.).  Dr. Lipsitz expressed the opinion that plaintiff has moderate restrictions in activities of daily living, marked difficulties in maintaining social functioning, and mild deficiencies of concentration, persistence, or pace.  (Id.).

The ALJ summarized Dr. Lipsitz's report and found that the assignment of a GAF score of 50 was inconsistent with the body of Dr. Lipsitz's report and plaintiff's own admissions.  (Tr. 12-13).  The ALJ then indicated that he was giving "little weight" to the GAF score assigned by Dr. Lipsitz.  (Tr. 13).  A GAF score of 50 is indicative of serious symptoms or any serious difficulty in social, occupational, or school functioning.[15]  The ALJ did not disregard the opinion of Dr. Lipsitz but, rather, found that the assignment of a GAF score of 50 was inconsistent with his own report.  Dr. Lipsitz was a consulting physician who had only examined plaintiff one time.  As such, the ALJ provided sufficient reasons for rejecting the GAF score of Dr. Lipsitz.

Mr. Stock described plaintiff's affect as constricted and her mood good, although nervous.  (Tr. 196).  Mr. Stock found plaintiff's thought processes to be intact, with no suicidal or homicidal thoughts.  (Tr. 197).  Plaintiff's judgment was found to be intact.  (Id.).  Mr. Stock described plaintiff's level of functioning as in the low average classification.  (Tr. 198).  Mr. Stock stated that plaintiff's mental status examination reveals that plaintiff is guarded, agitated, constricted in affect, anxious and depressed in mood, and soft and pressured in speech.  (Tr. 199).  Plaintiff's cognitive functioning was found to be intact, except for serial sevens and serial threes.

---

[15]See DSM-IV at 32.

(Id.).  Mr. Stock diagnosed plaintiff with panic disorder with agoraphobia and borderline

intellectual functioning, and assessed a GAF of 45.  (Id.).  Plaintiff described her activities of daily

living as follows: vacuuming for thirty minutes every day, cooking every day, going to the grocery

store two times each week, doing laundry once a week, taking care of the dogs on a daily basis,

bathing on a daily basis, and seeing her doctor and taking medications as indicated.  (Id.).  Mr.

Stock stated that plaintiff's social interaction skills appear to be impacted by her mental status, as

she reports going out once every six months.  (Tr. 200).  Mr. Stock found plaintiff's ability to

attend and concentrate to be impaired as to both serial sevens and serial threes.  (Id.).  Mr. Stock

expressed the opinion that plaintiff can no longer maintain a full-time position on the open labor

market due to her limitations.  (Id.).  Finally, Mr. Stock found that plaintiff is capable of handling

funds in her own best interest.  (Id.).  Mr. Stock indicated that plaintiff has marked restrictions of

activities of daily living, moderate difficulties in maintaining social functioning, and frequent

deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely

manner.  (Tr. 203).

The ALJ summarized Mr. Stock's report in detail.  (Tr. 13-14).  The ALJ found that Mr.

Stock's conclusions that plaintiff had a GAF score of 45, indicating major impairments in

functioning, and that she was unable to hold a full-time job due to her impairments are not

supported by the body of his evaluation.  (Tr. 13).  Specifically, the ALJ noted that plaintiff stated

that on a typical day she would take care of her disabled mother and her dogs, talk on the

telephone, watch television, take walks, swim in her pool, and go to the grocery store.  (Tr. 13,

199).  The ALJ stated that these activities do not appear consistent with an individual who has

"major" mental impairments.  (Tr. 13).  The ALJ also found that Mr. Stock's diagnosis of

borderline intellectual functioning is contradicted by Dr. Stock's own findings in his report that plaintiff was functioning in the low average range of intelligence. (Tr. 13, 198). Finally, the ALJ pointed out that Mr. Stock's evaluation was performed at the request of plaintiff's attorney in anticipation of litigation and not for treatment. (Id.). The ALJ thus assigned "little weight" to Mr. Stock's findings. (Tr. 14).

The undersigned finds that the ALJ provided sufficient reasons for assigning little weight to Mr. Stock's findings. The ALJ pointed out several inconsistencies in Mr. Stock's report. Further, Mr. Stock examined plaintiff only on one occasion at the request of plaintiff's attorney. The opinion of a one-time consulting physician is not generally entitled to significant weight.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> [t]hus, in light of the above, the undersigned finds not credible the claimant's descriptions of her symptoms and limitations of function. The undersigned finds that the claimant has no severe exertional impairments and the record establishes that the claimant's mental impairments preclude, at most: understanding, remembering and carrying out more than simple instructions and non-detailed tasks; maintaining concentration and attention on more than simple work; more than limited contact with the general public; and adapting to more than routine changes in the work place. These findings are consistent with the claimant's treating physicians, the claimant's own admissions, the findings of Dr. Lane, and the record as a whole. The substantial evidence does not establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment.

(Tr. 15).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel,

245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

Plaintiff contends that the ALJ erred in relying on the opinion of the non-examining state agency physician, Dr. Lane, in formulating plaintiff's residual functional capacity. Dr. Lane found that plaintiff's anxiety disorder caused no restrictions of activities of daily living; mild difficulties in maintaining concentration, persistence, or pace; and moderate difficulties in maintaining social functioning. (Tr. 76). Dr. Lane concluded that plaintiff retains the ability to perform simple, unskilled work with limited public interaction. (Tr. 78).

It is true that the opinion of a consulting physician who does not examine the claimant does not generally constitute substantial evidence. See Singh, 222 F.3d at 452. The ALJ, however, did not rely solely on the opinion of Dr. Lane. Rather, the ALJ's determination is based upon the record as a whole, including medical evidence from plaintiff's treating physicians and plaintiff's own testimony. Plaintiff indicated that she engaged in significant daily activities, which indicates that she has no restrictions of activities of daily living. Dr. Lane's finding that plaintiff has mild difficulties in maintaining concentration, persistence, or pace is consistent with the finding of Dr. Lipsitz. (Tr. 213). It is also consistent with the treatment notes of plaintiff's treating psychiatrist, Dr. Canale, who noted on May 21, 2003 that plaintiff had a normal flow of

thought, no psychotic symptoms, intact memory, and good insight and judgment. (Tr. 220). Dr. Lane's finding that plaintiff has moderate difficulties in maintaining social functioning is consistent with the opinion of Mr. Stock. (Tr. 203). Further, plaintiff's treating psychiatrist, Dr. Canale has not indicated that plaintiff has any long-term limitations of function.

The ALJ's residual functional capacity determination is supported by substantial evidence in the record as a whole. The ALJ performed a proper credibility analysis and determined that plaintiff's subjective allegations were not entirely credible. Plaintiff does not dispute the ALJ's finding that plaintiff's physical impairments cause no severe exertional limitations. In light of the evidence in the record, including the objective medical record and plaintiff's own testimony, there is substantial evidence in the record as a whole to support the ALJ's determination that plaintiff's mental impairments preclude, at most, understanding, remembering and carrying out more than simple instructions and non-detailed tasks; maintaining concentration and attention on more than simple work; more than limited contact with the general public; and adapting to more than routine changes in the work place.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**2.      Past Relevant Work**

Plaintiff argues that the ALJ erred in finding that plaintiff could perform her past relevant work. Specifically, plaintiff contends that the ALJ failed to make a finding of the physical and mental demands of her past job. Plaintiff also argues that the ALJ failed to discuss the effect of plaintiff's less than a tenth grade education and the fact that plaintiff failed the GED examination multiple times. Defendant contends that the ALJ properly determined that plaintiff could return to

her past relevant work.

Testimony from a vocational expert based on a properly phrased hypothetical question constitutes substantial evidence upon which to base an award or denial of Social Security benefits. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001). "A hypothetical question posed to [a] vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). It must "capture the concrete consequences of the claimant's deficiencies." Id.

The ALJ asked the vocational expert to assume a hypothetical individual who is age 26, with a ninth grade education and the same past work experience as plaintiff with the following limitations: able to understand, remember and carry out simple instructions and non-detailed tasks; able to maintain concentration and attention for simple work; able to respond appropriately to supervisors and co-workers in a task-oriented setting, where contact with the general public is limited, and able to adapt to routine changes. (Tr. 339). These limitations are consistent with the ALJ's residual functional capacity determination. The vocational expert testified that such an individual could perform plaintiff's past work as a busser. (Id.).

The ALJ noted in his hypothetical question that plaintiff had only a ninth-grade education. Although he did not specifically state that plaintiff had taken special education classes, he did state that plaintiff could only perform simple work. This is consistent with plaintiff's documented low-average intellectual functioning. With regard to the GED examination, plaintiff testified that she had never tried to obtain her GED. (Tr. 327). As such, the hypothetical posed to the vocational expert was proper.

The undersigned has found that the residual functional capacity formulated by the ALJ is

supported by substantial evidence. The hypothetical question posed to the vocational expert was based upon this residual functional capacity. The ALJ properly used vocational expert testimony to determine that plaintiff could perform her past relevant work as a busser.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act be **affirmed**.

The parties are advised that they have eleven (11) days, until September 8, 2008, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this    27th    day of August, 2008.

Lewis M. Blanton

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE